### TEXARKANA PIPE WORKS v. CADDO OIL & REFINING CO. OF LOUISIANA, Inc. (No. 2646.)

(Court of Civil Appeals of Texas. Texarkana. May 24, 1923. Rehearing Denied May 31, 1923.)

**1. Sales ⟨⟩ 181(11)—Evidence held insufficient to excuse nondelivery of fuel oil.**

In an action for the contract price of fuel oil, where the defense admitted the indebtedness, but by cross-action claimed damages for failure of plaintiff to furnish oil according to contract, by reason whereof defendant was obliged to buy oil elsewhere at an advanced price, and plaintiff relied, for excuse for such failure to deliver, on a contract clause excusing performance where failure to perform was directly or indirectly occasioned by act of God, evidence that a fire which destroyed one of defendant's oil refineries was not caused by spontaneous combustion without any intervention of human agency, but that the fire was due to leaking pipes, *held* insufficient to establish that the fire was due to an act of God.

**2. Contracts ⟨⟩ 322(1)—Burden of proving act of God excusing performance of contract on one alleging.**

The burden of proof of an act of God excusing the performance of a contract is on the one alleging it.

Appeal from District Court, Bowie County; Hugh Carney, Judge.

Action by the Caddo Oil & Refining Company of Louisiana, Inc., against the Texarkana Pipe Works. From a judgment for plaintiff, defendant appeals. Modified and affirmed.

See, also, 228 S. W. 586.

The appellee sued the appellant company to recover $4,633.51 as the alleged contract price for 2,059.22 barrels of fuel oil sold and delivered from November 26, 1918, to December 17, 1918, at $1.22 per barrel, and 1,285.45 barrels of fuel oil sold and delivered from January 4, 1919, to January 24, 1919, at $1.65 per barrel. Appellant admitted owing appellee for the number of barrels and the value of the oil sued for, but by cross-action sought to recover over and against the appellee, which was to be credited upon the amount admitted to be owing appellee, $3,-814.37 as the market price required to be paid for 6,968.4 barrels of fuel oil purchased on account of the appellee's failure to deliver that necessary number of barrels of oil under the contract during the months of June, July, August, and September, 1918. The appellant pleaded in the cross-action that in December, 1917, it exercised the option to renew and did renew and continue for the year 1918 the previously existing written contract between the parties, of date November 3, 1915, by which the appellee was to sell and deliver to appellant residuum oil or other fuel oil necessary to keep the appellant's pipe works at Texarkana in operation during the year 1918, not to exceed 30,000 barrels and not less than 20,000 barrels, at the price of $1.22 per barrel. The appellee filed a supplemental petition demurring and excepting to the petition of the cross-action, and pleading a general denial, and, specially in avoidance of any liability, that its failure to perform the alleged contract at the times alleged in the cross-bill was directly and indirectly occasioned by reason of the war between the United States and the German Empire, and by an act of God. The appellee further pleaded in avoidance of liability the provisions of paragraph 2 of article 1933 and the provisions of article 3556 of the Civil Code of the State of Louisiana. By supplemental petition the appellant pleaded matters in effect showing a lack of legal excuse for the breach of the contract.

The court submitted the case to the jury on the following special issues:

Q. 1. Did the defendant exercise the option set forth in the contract of date November 3, 1915, on or before December 31, 1917, and thereby continue said contract in force for the year 1918?

Q. 2. Was the failure of the plaintiff to perform the contract from the last of May to about November 20, 1918, directly or in-

---
⟨⟩ For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

directly occasioned by reason of an act of God?

Q. 3. Was the failure of the plaintiff to perform the contract from the last of May to about November 20, 1918, directly or indirectly occasioned by reason of the rules and regulations of the United States Fuel Administration .regarding the sale and conservation of fuel oil during the war?

Q. 4. Was the plaintiff by a fortuitous event or irresistible force hindered from performing the contract from the last of May to about November 20, 1918?

The jury answered each question, "Yes."

The court rendered judgment in favor of the appellee, as plaintiff, against appellant for the principal sum sued for and interest. Further, on the findings of the jury, the court rendered judgment against appellant on its cross-action.

The cross-action is based upon the claim that appellee was under a contract obligation to sell and supply appellant with all the fuel oil necessary to operate its plant at Texarkana, not to exceed a maximum of 30,000 barrels nor less than a minimum of 20,000 barrels, during the year 1918, at the price of $1.22 per barrel; that the appellee failed during June and July, a part of August, and a part of September, 1918, to ship any oil as it was under contract to do; and that as a result of such failure the appellant, during that period of time, was required to buy fuel oil elsewhere, and in doing so had to pay a price considerably in excess of the contract price. It was admitted on the trial that from June 1 to October 1, 1918, appellant bought from other parties 6,968.4 barrels of fuel oil for the sum aggregating $3,814.37 in excess of what it would have had to pay at the price of $1.22 per barrel. It was shown that the number of barrels of oil above mentioned was used in the necessary operation of the pipe works during the period of time mentioned above; and that, during the whole of the year 1918, 23,332 barrels of fuel oil were consumed in the necessary operation of the pipe works. On November 3, 1915, the Texarkana Pipe Works made a written contract at Shreveport, La., with the Caddo Oil & Refining Company of Louisiana (afterwards changed to Caddo Oil Refinery), the material parts of which are as follows:

"Said seller hereby agrees to sell and deliver to said buyer, and said buyer agrees to purchase and receive from the seller, between January first, 1916, and December thirty-first, 1916, the residuum fuel oil necessary to supply fuel and operate their pipe works at Texarkana, not to exceed a maximum of thirty thousand barrels, which maximum the seller agrees to furnish and the buyer to take if required for said purposes, and not less than a minimum of twenty thousand barrels, which minimum the buyer contracts and guarantees it will take and the seller agrees it will supply for such fuel purposes; it being understood that the seller represents and contracts that the residuum to be furnished hereunder is fit only for fuel purposes, and not to contain more than one per cent. water and to contain above 18,000 B. T. U.

"The seller agrees that all shipments of oil are to be made in tank cars furnished by the railroad company, and that the seller is to use due diligence at all times to procure empty cars in which to make shipments, to the end that there will be no delay in the furnishing of oil on this contract, by reason of an insufficient number of cars being received in which to make shipment.

"It is further agreed and understood that all shipments and deliveries of said oil shall be f. o. b. cars railway tracks at Shreveport, Louisiana, and the purchaser shall pay sixty-two cents (62¢) per net barrel of forty-two (42) gallons for said oil, payment to be made on the first and fifteenth day of each month for all oil received prior to the day of payment.

"It is further agreed by the seller that shipments shall be made by it within two days after receipt of written order therefor, from the buyer. It is further agreed that the seller shall not be required to ship hereunder more than 3,000 barrels of residuum fuel oil in any one month, nor more than one car in any one day.

"Seller agrees to begin shipment of oil hereunder on January first, 1916.

"In consideration of the purchase of residuum fuel oil by the buyer as above set forth, the seller hereby gives to the buyer an option on residuum fuel oil required to operate their pipe works at Texarkana during the years 1917 and 1918 on the following terms: Contract price of 62¢ above set forth is based on price on light Caddo crude of 80¢ per barrel in the field. Price for contract on residuum oil for the year 1917 to be based upon field price of light Caddo crude on December first, 1916, and contract price for the year 1918 to be based upon the field price of light Caddo crude December first, 1917. On the dates mentioned, should the field price of light Caddo crude be 80¢, then the contract price for the following year for residuum fuel oil would be 62¢ per forty-two gallon barrel f. o. b. Shreveport. In case there is an advance in the price of light Caddo crude, one-half of the advance to be added to the price of 62¢ on residuum fuel oil. In case there is a decline in the price of light Caddo crude, one-half of the decline to be deducted from the price of 62¢.

"It is expressly agreed and understood that neither of the parties hereto shall be liable to the other for failure to perform and respect obligations to this contract or any part thereof when such failure to perform is directly or indirectly occasioned by reason of any war, invasion, insurrection, blockade, riot, flood, earthquake, act of God, strike or other labor disturbance, in the United States or any foreign country.

"This contract is executed in duplicate."

The appellee complied with its contract and furnished appellant the required fuel oil during the year 1916. On December 12, 1916, the appellant wrote appellee the following letter:

"Caddo Oil Refinery, Shreveport, La.—Gentlemen: Your letter of December 23 is received. You will please continue to supply fuel oil for our requirements during 1917 at 72 cents per 42 gallon barrels f. o. b. your plant, as per our contract dated November 3, 1915.

"Yours very truly,
"Texarkana Pipe Works."

Appellee under the above renewal supplied the appellant with the required fuel oil for the year 1917 at the price stated. On December 4, 1917, the appellant wrote the appellee the following letter:

"Caddo Oil & Refining Co. of Louisiana, Shreveport, La.—Gentlemen: This is to advise you of our intention to exercise our option to purchase fuel oil from you during 1918. We understand the price of Caddo light crude on December 1 was $2.00. This is $1.00 advance over the price December 1, 1916, which under our contract would make a fifty cent advance in the price of residuum, making the price of the residuum for 1918 $1.22 f. o. b. your refinery at Shreveport.

"Yours truly,    Texarkana Pipe Works."

The evidence shows, in effect, an extension and continuance by the parties for the year 1918 of the contract of 1915 at $1.22 per barrel, being according to the scale contained in the option. The appellee complied with the contract and supplied the required fuel oil during the year 1918 except during the period of time from May 29 to about October 1, 1918.

The appellee was engaged in refining oil in the years 1915, 1916, 1917, and 1918. In 1918 the appellee owned the Caddo Oil Refinery at Cedar Grove, and the Shreveport Refinery at Shreveport. On May 26, 1918, the refinery located at Cedar Grove, about four miles from Shreveport, caught fire and was destroyed. According to the evidence it appears as follows:

"We had to adjust our insurance before we could begin rebuilding, and after that we rebuilt it just as speedily as possible. We had to tear down and rebuild everything. It cost right around $200,000 to rebuild that refinery. There were nine stills in operation in that refinery before the fire, and we were not able to run any of those stills after the fire, but we got one back in operation, I think either the 1 or 4 of July—it was in the early part of July—and we did not finally complete it until in December."

All the evidence in the record pertaining to the destruction of the refinery by fire is that given by the appellee's superintendent, viz.:

"I was there when that refinery caught fire. We really don't know what caused the fire. It happened on Sunday morning about 11 or 12 o'clock. I was in the receiving house where the oil runs in from the still, and I heard an explosion, and before I could get out everything was afire. The explosion occurred on one of the stills. A still is a big tank or boiler. We charge the still with crude oil. When we have a regular charge we put fire underneath, and when it comes off the oil comes off in a vapor and then into a condenser box; that condenses the oil into a light oil. It was one of these stills that exploded, and the fire started from that at once, and as a result it burned the whole refinery down. There was a fire underneath the still that exploded; the fire is simply under the boiler, and when it hasn't any fuel the heat goes out the back end of the still. No one could tell what caused the explosion; there is really no reason for it, no known reason. We had first-class machinery, and we always use the very best of care to keep it in first-class condition, and we did that in this instance. The machinery we used was modern, the very latest machinery. That explosion occurred without any known reason to me."

On cross-examination:

"We have an engineer, and we had a stiller, somebody around the still—Pete Malone operates the stills. We had to have an expert to do that, specially trained, as it is dangerous unless you do have experts. A fire will cause oil to explode. If one of the pipes get a leak in it, fire will not necessarily cause the oil to explode; it would just leak and the fire would burn on the outside, but would not necessarily explode. I don't say it couldn't explode that way, but I never saw it explode that way. I never saw this one explode. I have seen leaking pipes with the oil running out in the fire under the still. We have leaks occasionally, and that is when we have small fires, but that don't necessarily cause explosions; it is not customary, but it frequently happens. If you have got a leaking pipe, the leak grows bigger, and it in time gets big enough to cause an explosion. I don't know what caused this explosion, because it didn't leak to my knowledge. We just had the one explosion. The other stills did not burn up, just the one."

During the year 1918 the appellee had written contracts for sale of fuel oil, besides appellant's, with the Rio Bravo Oil Company, Lufkin Land & Lumber Company, St. Louis & Southwestern Railway Company, Meeker Sugar Refining Company, Longville Lumber Company, and Louisiana & Pacific Railway Company. It was shown that appellee was licensed by the United States Fuel Administration in accordance with the provisions of an act of Congress approved August 10, 1917 (U. S. Comp. St. 1918, U. S. Comp. St. Ann. Supp. 1919, §§ 3115⅛e–3115⅛kk, 3115⅛l–3115⅛r), and that under the rules and regulations promulgated by the Fuel Administrator the appellant was in classification 12, and that the above-mentioned contracts were embraced in classifications 1, 9, and 11, having preference and priority over classification 12. During the period of disablement by reason of the destruction of the refinery the appellee delivered to the above classifications 1, 9, and 11 all the fuel oil it produced in June and July and all the fuel oil it produced in part of August and in part of September. Appellant was furnished some fuel oil in part of August and

in part of September. The appellee and appellant both introduced in evidence that part of the Code of Louisiana copied in the several pleadings.

John J. King and J. I. Wheeler, both of Texarkana, for appellant.

J. Q. Mahaffey and Keeney & Dalby, all of Texarkana, for appellee.

LEVY, J. (after stating the facts as above). [1] The appellant insists that under the evidence it was entitled, as a matter of law, to have judgment rendered in its favor; and we conclude that appellant is entitled to have judgment here rendered in its favor on the cross-action. It is again determined, as on the former appeal, that the option stipulation in the contract of November 3, 1915, was in effect an agreement to renew or extend during the two succeeding years the original contract on the terms therein stated, but at the prices stipulated in the option clause, and became a binding contract for sale on its acceptance by appellant. Texarkana Pipe Works v. Caddo Oil & Refining Co. (Tex. Civ. App.) 228 S. W. 586. The evidence conclusively shows an acceptance in writing in the time required, and a part performance thereunder of the contract of sale by appellee. There is no dispute in the evidence that the appellee failed to deliver and the appellant had to purchase in the market 6,968.4 barrels of oil, which was necessary for the operation of the pipe works, during June and July, a part of August, and a part of September, 1918. It is admitted that appellant paid $3,814.37, as the market value of the oil, in excess of what it would have cost at the contract price of $1.22 per barrel. As an excuse for the partial performance of the contract by it, the appellee relied on the conditions of the contract which would excuse performance by it; and further pleaded the provisions of paragraph 2 of article 1933 and article 3556 of the Civil Code of Louisiana. The conditions in the contract, as pleaded, are:

"It is expressly agreed and understood that neither of the parties hereto shall be liable to the other for failure to perform and respect obligations to this contract or any part thereof when such failure to perform is directly or indirectly occasioned by reason of any war * * * or act of God."

The provisions of the Louisiana Code, as copied in the record, are:

"Where, by a fortuitous event or irresistible force, the debtor is hindered from giving or doing what he has contracted to give or do, or is from the same causes compelled to do what the contract bound him not to do, no damage can be recovered for the inexecution of the contract. Fortuitous event is that which happens by a cause which we cannot resist."

It appears that the appellee owned the Caddo Oil Refinery at Cedar Grove and the Shreveport Refinery at Shreveport. From these two refineries the appellee was supplying under contracts of sale fuel oil to appellant and to some six other concerns. The refinery at Cedar Grove was destroyed by fire about May 26, 1918, and by reason thereof the appellee was unable for a time to furnish and deliver all the oil contracted. The appellee supplied the six concerns during June, July, August, and September, and did not supply appellant during this time except in part of August and in part of September. Under the restrictions laid upon the appellee by the United States Fuel Administration, it was, under the evidence, clearly required, we think, to give preference to the six named concerns in furnishing the oil obtainable from the remaining refinery after the destruction by fire of the other refinery. But being required to give preference to the named concerns would not relieve appellee from liability for failure to perform its contract with appellant, unless the destruction by fire of the refinery at Cedar Grove was occasioned (1) by an act of God, or (2) by a fortuitous event or irresistible force, as used in the Civil Code of Louisiana. If the partial performance of the contract with appellant was not hindered and made impossible of performance by either of the two events, then the appellee, as a matter of law, would not be excused from performing the thing it agreed to do. The evidence regarding the loss by fire does not exclude, or tend to exclude, the idea of human agency or intervention. The evidence suggests, even reasonably accounts for, the origin of the fire to be leaking pipes. The fire was not caused by spontaneous combustion without any default or intervention of human agency. Some negligence or oversight regarding the condition of the pipes is evidence.

[2] The burden of proof was upon the appellee to show a destruction of the refinery through an "act of God," as the term is used in law, and that burden is not met in the evidence offered. And we conclude that the evidence regarding the fire in question also fails to show that the destruction of the refinery was an accident occasioned by a "fortuitous event" or by "irresistible force," as used in the Louisiana Code. The "fortuitous event" is defined by the Code as being "that which happens by a cause which we cannot resist." As construed, the term means "an accident which human prudence can neither foresee nor prevent." Lehman, Stern & Co. v. Ry. Co., 115 La. 1, 38 South. 873, 70 L. R. A. 562, 112 Am. St. Rep. 259, 5 Ann. Cas. 818. "Irresistible" or "superior force" is a force which absolutely cannot be resisted or controlled. 38 South. supra. Quoting from the case supra:

"In the civil law loss by fire is not considered a fortuitous event, as it arises almost invariably from some act of man."

The peremptory instruction should have been given.

The judgment, so far as it denies any recovery on the cross-action, is modified so as to allow a recovery in favor of appellant against appellee on the cross-action in the sum sued for, and as so modified the judgment will then in all things be affirmed. The appellee is to pay costs of the appeal.